UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| CHANDRA MOHN, <br><br>          Plaintiff, <br><br> v. <br><br> VERTIV, INC. and KRISHNA GHANTA, <br><br>          Defendants. | ECF Case <br><br> No. _____ <br><br> **COMPLAINT AND JURY DEMAND** |

Plaintiff, Chandra Mohn ("Plaintiff"), through his attorneys, Lipsky Lowe LLP, files this Complaint and Jury Demand seeking compensatory damages, liquidated/punitive damages, attorneys' fees, and costs of suit from Defendants, Vertiv, Inc. ("Vertiv") and Krishna Ghanta ("Ghanta"), (collectively, "Defendants") and alleges as follows:

## FACTS

**A.   Jurisdiction and Venue**

1. This Court also has subject matter jurisdiction over this matter under 28 U.S.C. §§ 1331 and 1337, 1343, and supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

2. Venue is proper in this district under 28 U.S.C. §1391(b)(1) and (2).

**B.   The Parties**

3. Plaintiff resides in Franklin Park, New Jersey.

4. Defendant Vertiv is corporation authorized to do business in the State of New Jersey, with its principle place of business at 5 Vaugh Drive, Princeton, New Jersey 08540.

3. Ghanta was at all relevant times a resident of New Jersey, and the owner and CEO of Vertiv, as well as its predecessor Bintel Group, who, either directly or indirectly, has hired and

fired Plaintiff Mohn and other employees, controlled Plaintiff's work schedule and employment conditions, determined his payment rate and method, repeatedly underpaid or failed to pay Mohn's salary or deliver equity, and kept at least some records regarding their employment.

5. Ghanta was an employer as the term is defined under the Fair Labor Standards Act and the New Jersey Labor Law.

6. Defendants employed Plaintiff at 5 Vaugh Drive, Princeton, New Jersey 08540.

**C.   Plaintiff's Employment**

7. In 2011, Mohn was employed as a Senior Vice President for Citigroup, Inc., earning approximately $250,000.00 per year. At that time, Ghanta, the CEO of Bintel Group ("Bintel"), predecessor in interest to Vertiv, approached Mohn and offered him the position of Chief Technology Officer. They agreed on an employment contract, including a salary of $200,000 per year, plus equity stake in Bintel.

8. Mohn reasonably relied on the promises and representations made by Defendants about the terms of the employment contract, and as a result Mohn quit his job at Citigroup, Inc., where he had worked for over five years.

9. Mohn began employment at Bintel in late 2011 and exceeded the goals of his role—more than fulfilling the terms of his employment agreement with Ghanta.

10. Shortly after Mohn commenced employment with Bintel, Ghanta began failing, first, to pay him timely, and then, to pay him correctly, and ultimately to pay him at all.

11. At the end of August 2012, Mohn e-mailed Ghanta a request that he "please deposit [his] salary." Multiple emails and days later, when the wages had not been duly paid, Mohn followed up again. Ghanta claimed he was having a "problem with his system," and that

he would update Mohn the next day "once [he] check[s] the account [to see] if there r [sic] any funds."

12.     This scenario repeated itself *more than twenty times* throughout Mohn's employment for Ghanta.

13.     For example, on April 1, 2013, Mohn e-mailed Ghanta, "I am very tight this month and I need salary. I have multiple items that are piled up for payments and I have been postponing for a while and can't postpone anymore." Several e-mails and two weeks later and Mohn still has not received his salary, so Mohn e-mailed Ghanta again: "I am in real trouble without salary. I have used up all my savings and reserves" and "Just now checked in my back [sic] account. The funds are not transferred." Ghanta replies, "No sir. . . come tomorrow."  The payment did not come as promised.

14.     By way of further example, on October 29, 2013, Mohn e-mailed Ghanta again, "Can you please arrange to deposit my salary." After three e-mails, Ghanta promised to do it Monday, November 3, 2013. Consistent with his prior history, however, there is no payment made on November 3.  So, on Tuesday, November 4, 2013 Mohn asks again. Ghanta replies, "I will sort it out sir."

15.     By the end of November 2013, Mohn was owed ten months of salary, *or almost $170,000.00,* forcing Mohn to exhaust his savings and sell some of his investments. Ghanta apologizes for the repeated delays and non-payment: "[D]on't take me wrong [I] am trying to solve problem permanent[ly], so just be patient on me."  Again, Ghanta did not resolve the problem

16.     The problem persisted in 2014 and 2015, requiring that Mohn to repeatedly continue to *ask his employer* for the wages that were duly and lawfully owed him.  Indeed, on June

3

9, 2015, after repeated e-mails that went ignored by Ghanta, and a delay of nine days, Mohn remarked to Ghanta, "Looks like no one wants to talk about my salary. This is not good."

17. Even when Ghanta would, after repeated delays, pay Mohn for his services, the checks given him would often be underpayments of the amount owed and/or would bounce, resulting in fees and penalties to Mohn.

18. Finally, Mohn had enough of the excuses, delays, non-payments, bounced checks, and fees and penalties, and in November 2015, he resigned his position, noting: "I took a 20% cut when I joined you. As you may be aware (or not), during the time I worked for you, I have racked up 12 months of no payment and 12 months of 60% payment, which has depleted my entire saving (200K) and has left me with 0 for all the work I did for the last 15 years. Is there a way for you make due for this?"

19. Mohn was forced to resign his position because Ghanta had failed to pay him some $280,000.00. And this fact does not even take into account that Ghanta also failed to deliver the promised equity, itself potentially worth hundreds of thousands of dollars or more, and a material term of their contract that ultimately induced Mohn to leave his position at Citibank and take a pay cut.

20. Notwithstanding the fact that Ghanta had illegally withheld over a quarter of a million dollars of duly-owed compensation *and* failed to give him the promised equity, Mohn closed with: "I will help you in any way possible even after I leave. I hope our paths cross again." In response, Ghanta acknowledged he owed the money, and stated: "I will keep paying without fail"—Another empty promise, as Mohn has yet to see a dime of this money.

21. After Mohn resigned his employment with Bintel, then operating as Vertiv, Mohn joined Mphasis in the role of Vice President and Chief of Engineering at a salary of $222,000.00

per year. Mphasis, unlike Vertiv, paid his salary timely and correctly, and did not require Mohn to have to beg for his wages each month. However, in or about mid-2017, Mphasis was acquired by a private equity group who, in late 2017, shuttered the division in which Mohn worked, forcing Mohn to begin searching for another job.

22. Mohn had kept in touch with Ghanta throughout his time at Mphasis, and when Ghanta learned of Mohn's job search, he offered Mohn a job.

23. Given his prior experience with Ghanta, Mohn was circumspect, and insisted that he would only return to Vertiv if he was a member of the revenue generating side. In other words, Mohn demanded to work at a client of Vertiv so that he could assist Vertiv in bringing in revenue, to mitigate the risk that Vertiv would again fail to pay him. Ghanta agreed.

24. Following additional negotiations, Ghanta and Mohn agreed upon the following contractual terms: (i) Mohn would return to Vertiv in mid-November 2017; (ii)While Vertiv had several promising business leads, Vertiv did not then have a client at which to immediately place him. As a result, Mohn would be working for Vertiv internally, during which time he was to be paid a "base" or "nominal" salary of $150,000.00 per year, or $12,500.00 per month; and (iii) Ghanta would place him at a client as soon as practicable, and once placed, Mohn would earn his monthly base salary *plus* the difference between his full client billable rate and his base salary, to be paid on a quarterly basis (the "Quarterly Payment"). For example, Mohn's base salary computes to about $75.00 per hour ($12,500 / 21 working days per month / 8 hours per day). Assuming Mohn's full billable rate at a future client would be $130.00 per hour, Ghanta promised that he would pay Mohn about $75 per hour base plus $55.00 per hour to match his full billable rate of $130.00 per hour. The $55.00 per hour, or $9,240.00 per month ($55.00 x 8 hours per day x 21

working days per month), would be paid quarterly in amounts of $25,000.00 ($27,720.00 – $2,720.00 handling fee).

25. Ghanta and Mohn expressed and understood, the third negotiated point was a *sin qua non* of the agreement, as $150,000.00 per year was a significant reduction from his most recent salary, and indeed, even from his prior salary working for Vertiv in 2015.

26. In April 2018, after the first quarter of work, Mohn only received his base salary payment, and none of his first Quarterly Payment. Mohn therefore e-mailed Ghanta, who has never disputed his agreement with Mohn and has consistently acknowledged its existence, asking why he had only received some of his base salary. Ghanta responded that the $6,250.00 "is just nominal as we enter, coming period or following period based on cash flow 25K will be added sir."

27. The next month, Mohn did not receive the first Quarterly Payment either, so e-mailed Ghanta again, who responded: "I will release regular [base payment] and send additional payment [Quarterly Payment]." Six days later, Mohn had received nothing, so reached out to Ghanta once again: "Any idea when I can expect the [Quarterly Payment]?" Krishna responded: "Once [e]verybody payroll dispatch is over I will send 25k." However, just like in 2015, Mohn never received a dime.

28. Although Ghanta promised him that $25,000.00 would be paid him, the amount *should* have been $27,300.00 ($135.00 less $78.13 = $56.88/hour; $56.88 x 8 hour per day x 20 workdays per month x 3 months per quarter = $27,300.00).

29. In an e-mail to Ghanta, on about June 6, 2018, Mohn resigned his position for the second time due to non-payment: "There is no easy way to say this so I will say it straight. I am moving on. Please accept this email as my resignation from vertiv. . . . I have also decided to leave

the country. . . . Please don't hesitate to call me anytime for anything. I would have liked to be part of vertiv success."

30. At the time, Vertiv had failed to pay Mohn the (i) the first Quarterly Payment, (ii) the second Quarterly Payment, and (iii) $6,250.00 owed him for the first two weeks of June 2018.

31. Later that evening, Mohn explained to Ghanta the reasons for his resignation, *i.e.,* that he could not afford to pay his expenses solely based on the $150,000.00 base salary and that he had been offered nearly $100,000 more (though the position, which would begin on June 18, 2018, would require him to move to Canada).

## COUNT I

### Fair Labor Standards Act

32. Plaintiff repeats and incorporates the facts alleged in the preceding paragraphs as if fully set forth herein.

33. At all relevant times, Defendants employed Plaintiff.

34. Defendants have been and continue to be, employers engaged in interstate commerce and/or the production of goods for commerce, within the meaning of the FLSA, 29 U.S.C. §§ 206(a) and 207(a).

35. Defendants knowingly failed to pay Plaintiff for all hours worked, including the minimum wages to which he was entitled under the FLSA.

36. Because Defendants' violations of the FLSA have been willful, a three-year statute of limitations applies under 29 U.S.C. § 255.

37. As a result of Defendants' FLSA violations, Plaintiff has suffered damages by being denied wages for all hours worked, including minimum wages in accordance with the FLSA in amounts to be determined at trial, and are entitled to recovery of such amounts, liquidated damages,

prejudgment interest, attorneys' fees, costs, and other compensation, and such other legal and equitable relief as this Court deems just and proper.

## Count II

### Violation of New Jersey Labor Law
### (Minimum Wage and Timing)

38. Plaintiff repeats and incorporates the facts alleged in the preceding paragraphs as if fully set forth herein.

39. Defendants failed to pay Plaintiff at the agreed upon rate for all hours worked, and in many instances failed to pay him at all.

40. Defendants wrongful conduct violated New Jersey Minimum Wage Law, including, N.J.S.A. §§ 34:11-56a & 56a4, as well as New Jersey Wage & Hour Regulations concerning wage payment and timing of wage payments, including N.J.A.C. §12:56-5.1

41. As a result of Defendants' wrongful conduct, Plaintiff has suffered, and continues to suffer damages including: back pay, liquidated damages and other consequential damages.

## Count III

### Violations of New Jersey Wage Payment Act
### (Unpaid Wages)

42. Plaintiff repeats and incorporates the facts alleged in the preceding paragraphs as if fully set forth herein.

43. Defendants are employers within the meaning of New Jersey Wage Payment Act, N.J.S.A. § 34:11-4.1, et seq. (the "WPA") and in particular N.J.S.A. § 34:11-4.1(a).

44. Plaintiff was an employee of Defendants within the meaning of the WPA, under N.J.S.A. § 34:11-4.1(b).

45. The payments due to Plaintiff from Defendants, including but not limited to Plaintiff's salary, constitute unpaid wages within the meaning of the WPA.

46. Defendants have failed to pay Plaintiff all of his unpaid wages when they were due, in violation of the WPA, N.J.S.A. § 34:11-4.2.

47. Defendants failed to notify Plaintiff of any changes in his pay rate or pay days during Plaintiff's employment in violation of N.J.S.A. § 34:11-4.6.

48. Defendants knowingly failed to pay Plaintiff all of his wages due, including his salary, to which he was entitled under WPA.

49. Defendants' violations of the WPA have been willful.

## Count IV

### Promissory Estoppel

50. Plaintiff repeats and incorporates the facts alleged in the preceding paragraphs as if fully set forth herein.

51. Defendants made numerous clear and definite promises and representation to Plaintiff, including but not limited to promises, representations and assurances regarding Plaintiff's employment as the Chief Technological Office with an annual salary of $200,000.00, as well as equity compensation that Plaintiff was going to earn.

52. Defendants expected Plaintiff to reply on the promises and representations made to him about his salary and equity compensation.

53. Plaintiff reasonably relied on the promises and representations Defendants made to him, to his detriment, by actions including but not limited to agreeing to work for the Defendants, quitting his job with an annual salary of $250,000.00 as Senior Vice President for Citigroup Inc.,

providing Defendants with highly qualified services and financial benefits, and foregoing other possible career opportunities and compensation while working for Defendants.

54. Under the circumstances, it would be unjust and inequitable not to enforce Defendants' promises and representations to Plaintiff.

55. As a direct and proximate result of Defendants' actions, Plaintiff has experienced a definite and substantial detriment in the form of a loss of wages and equity compensation, loss of Plaintiff's pervious employment with an annual salary of $250,000.00, exhaustion of all of Plaintiff's life savings and reserves in the amount of approximately $200,000.00, and accumulation of thousands of dollars of debt and late fees.

56. Plaintiff respectfully requests a judgment against Defendants, jointly and severally, including but not limited to, for: (1) lost wages; (2) lost equity compensation; (3) loss of $250,000.00 salary Plaintiff gave up to work for Defendants; (4) loss of savings in the amount of $200,000.00; (5) compensation for debts and late fees; and (6) all other relief that the Court deems equitable and just.

### Count V

### Breach of Contract & Implied Covenant of Good Faith and Fair Dealing

57. Plaintiff repeats and incorporates the facts alleged in the preceding paragraphs as if fully set forth herein.

58. During each of his employment terms with Vertiv, including its predecessor Bentel, Plaintiff entered into an employment contract with Defendants setting forth all of the material terms of their employment relationship, including duties and compensation –both salary and equity compensation.

59. Plaintiff performed all duties and responsibilities required by those contracts.

60.     Defendants breached those contracts and the implied covenant of good faith and fair dealing by (i) failing to timely pay salary; (ii) failing to pay salary in full; (iii) failing to pay salary at all; and/or; (iv) failing to deliver promised equity.

As a result of Defendants' breach of conduct, Plaintiff has suffered, and continues to suffer damages including: back pay, compensatory and consequential damages.

### Count VI

### Unjust Enrichment

61.     Plaintiff repeats and incorporates the facts alleged in the preceding paragraphs as if fully set forth herein.

62.     Defendants received the benefits of Plaintiff's work throughout his employment, including his daily services to Defendants and Defendants' clients, the latter of which Defendants received remuneration from those clients, yet failed to pay or underpaid Plaintiff, and failed to deliver to him the promised equity.

63.     Plaintiff had a reasonable expectation of remuneration for his work given the parties relationship and interactions as described above.  Defendants failed to provide said remuneration, including salary and equity.

64.      As a result of Defendants' misconduct, Plaintiff has suffered, and continues to suffer damages including: back pay, compensatory and consequential damages.

**WHEREFORE**, Plaintiff seeks judgment all Counts against Defendants, jointly and severally, awarding him compensatory damages, punitive damages, liquidated damages, attorneys' fees, costs of suit, pre- and post-judgment interest, in an amount to be established at trial but believed to be in excess of $1,000,000, and all other relief that the Court deems equitable and just.

## **DEMAND FOR TRIAL BY JURY**

Plaintiff demands a trial by jury on all issues so triable.

**LIPSKY LOWE LLP**

Dated: October 16, 2018

By: s/ Christopher H. Lowe
Christopher H. Lowe
Milana Dostanitch
LIPSKY LOWE LLP
630 Third Avenue, 5th Floor
New York, New York 10017
212.392.4772
chris@lipskylowe.com
milana@lipskylowe.com
*Attorneys for Plaintiff*